**In re SUMMIT CREEK PLYWOOD COMPANY, INC., dba Summit Creek Forest Products Corp., Bankrupt.**

**Robert BUTTS, Trustee in Bankruptcy of Summit Creek Plywood Company, Inc., Plaintiff,**

**v.**

**BENDIX FOREST PRODUCTS CORPORATION (formerly American Forest Products), Georgia-Pacific Corporation, and Walter E. Heller Western Incorporated, Defendants.**

**Bankruptcy No. 78–00911.**

United States Bankruptcy Court, D. Oregon.

Sept. 23, 1982.

95th Cong., 1st Sess. 343 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6300.

Gilbert E. Parker, Jr., Portland, Or., for Georgia Pacific Corp.

Elizabeth L. Perris, Portland, Or., for trustee-Butts.

Douglas G. Beckman, Portland, Or., for Walter E. Heller Western Inc.

## MEMORANDUM OPINION

HENRY L. HESS, Jr., Bankruptcy Judge.

In response to a motion of the defendant, Bendix Forest Products Corporation (Bendix), for an order dismissing this action for lack of prosecution the court entered on August 7, 1980 its memorandum opinion and an order dismissing the action pertaining to car no. SP224006 and denying the motion as it pertained to car no. SP223364 and car no. SP224409.

The plaintiff, Robert Butts, trust, and Bendix have each filed motions for summary judgment. These motions raise three principle issues.

1. Did Bendix properly stop the goods in transit?

2. Did the defendant, Walter E. Heller Western Incorporated (Heller) obtain

a perfected security interest in the goods?

3. Did Bendix properly exercise its right to reclaim the goods?

In order of chronology the facts are as follows. In 1976 Heller obtained from the bankrupt, Summit Creek Plywood Company, Inc. (Summit) a security agreement and filed financing statements with the recording officer for Clackamas County, Oregon and with the Secretary of State. On April 3, 1978 Summit ordered the two carloads of lumber in question from Bendix. Bendix, on April 18 and 19 shipped the goods to Summit to Topeka, Kansas for furtherance. The bills of lading showed Bendix as the shipper and Summit as the consignee. On April 25 Summit sold the goods to Georgia Pacific Corporation with delivery to be made in Manchester, New Hampshire. On April 26, Summit notified the carrier to divert the two cars to Georgia Pacific in Manchester. These instructions were followed. When the cars reached Pueblo, Colorado Summit sold and assigned the Georgia Pacific account receivable to Heller. In exchange for this and other receivables, Heller advanced Summit the sum of $75,600 in accordance with the security agreement. On May 1 Bendix notified the carrier to stop shipment. This was after the cars had left Topeka but prior to their arrival at Manchester. The carrier complied with these instructions. Heller made demand upon Georgia Pacific for payment which was refused because Georgia Pacific never received the goods.

## STOPPAGE IN TRANSIT

In ruling upon the motion to dismiss for lack of jurisdiction it was necessary for the court to determine whether at the time of the issuance of the instructions by Bendix to the carrier to stop in transit, Bendix still had the right to stop the goods in transit. The court in its memorandum opinion and its order of August 7, 1980 found that the right of Bendix to stop the goods in transit had expired prior to its attempted exercise by Bendix on May 1. This is now the rule of the case and need not be reexamined by the court.

## THE SECURITY INTEREST

The security agreement signed by Summit and Heller describes the collateral as follows:

"You hereby grant to us a continuing lien and security interest in all accounts, contract rights, instruments, chattel paper and general intangibles which are now existing and owed by you and in all which will hereafter arise or be acquired by you, however the same shall arise or be acquired, in all returned or repossessed goods arising therefrom or relating thereto, in all reserves, funds, monies, sums or property now existing and in all hereafter arising in which you may have or acquire any interest whatsoever and which are or may hereafter come into our hands, in all monies now or hereafter payable to you pursuant to this Agreement, in all proceeds of all of the foregoing and in all of your books and records pertaining, in whole or in part, to any of the foregoing."

The filed financing statements describe the collateral as follows:

"All of the following now owned and all hereafter acquired by Debtor, all hereafter arising in favor of Debtor, all proceeds of all of the foregoing and all returned or repossessed goods arising therefrom or relating thereto; accounts, contract rights, instruments, chattel paper, general intangibles, customer obligations, howsoever arising, whether on open account or on deferred or installment terms, and all monies or claims for monies due or to become due thereunder; inventories of every kind and description, including, but not limited to, logs, lumber and veneer, whether now owned or hereafter acquired, together with any and all proceeds resulting from the sale or other disposition thereof; and all books and records pertaining, in whole or in part, to any of the foregoing."

It is to be noted that the security agreement does not use the term "inventory" as do the financing statements.

■ The UCC provides that a reclaiming seller takes subject to perfected security interests in after acquired inventory. If Heller had a perfected security interest in the goods it would have arisen when the goods become a part of the inventory of Summit. This occurred when the carrier complied with Summit's request to reship the goods to Manchester. This reshipment occurred prior to the notice on May 1 to the carrier to stop in transit. This reshipment also occurred prior to the telegram from Bendix to Lon Bryant on May 1 which Bendix claims to constitute a notice of reclamation under the UCC (ORS 72.7020). Thus if Heller had a security interest in the goods on May 1, a reclaiming of the goods by Bendix would be subject to the prior security interest of Heller and Bendix would be responsible to Heller for the value of the goods.

■ The UCC requires that a security agreement contain a description of the collateral and that it be signed by the debtor [ORS 79.2030(1)(a) ]. A security agreement need not be labelled as a security agreement. A financing statement which grants a security interest and is signed by the debtor may constitute a security agreement. Although not mentioned by counsel in their motions for summary judgment and their memoranda, it is observed by the court that in 1976 amendments to the financing statements were filed with the county recording officer and the secretary of state, which amendments referred to the original financing statements and included the language "Inventories of any kind and description including but not limited to logs, lumber, veneer and plywood, whether now owned or hereafter acquired." See Exhibit B pages 17 and 19 attached to the motion for summary judgment filed by the plaintiff on December 2, 1980. These filed amendments were signed by the debtor, Summit. Some cases have held that for a financing statement to constitute a security agreement there must be "words of grant" of a security interest. See *American Card Co. v. H.M.H. Co.,* 97 R.I. 59, 196 A.2d 150 (R.I. 1963). The better rule however is that a financing statement may constitute a security

ity agreement if it appears that there was an intent on the part of the debtor to create a security interest in the lender. See *In re Numeric,* 485 F.2d 1328 (1st Cir.1973).

■ The obvious purpose of filing the amendments to the filed financing statements, at least so far as Heller was concerned, was to give notice and perfect a security interest in inventory. Summit's signature on the amendments can only be explained as an intention on the part of Summit to grant a security interest in such inventory. The court therefore finds that the amendments fulfilled the requirements of a security agreement and granted Heller a security interest in inventory. These amendments also served the purpose of perfecting such security interest.

■ The holder of a prior perfected security interest in future acquired inventory has priority over a reclaiming seller. *Los Angeles Paper Bag Company v. James Talcott, Inc.,* 604 F.2d 38 (1979, 9th Cir.). It might be argued in some factual situations that while a secured party is a purchaser under the UCC he is not necessarily a purchaser in good faith. Such an agreement would not be applicable in this case since Heller took an assignment of the account receivable from Georgia Pacific and advanced further funds to Summit after the purchase of the goods in question from Bendix and before May 1, the date of the telegram which Bendix asserts was a notice of reclamation under ORS 72.7020. The court therefore concludes that Bendix is liable to Heller for the value of the goods in question.

It is asserted by Heller that the value of the goods is the sum which Georgia Pacific had agreed to purchase them for of $32,-143.78. There having been no assertion by Bendix that the goods were of a lesser value, judgment should be entered herein for Heller against Bendix in that amount.

The parties raised the question as to whether the security agreement granted a security interest in inventory. In view of the court's finding that the amendments to the financing statements constituted a se-

curity agreement granting a security interest in inventory a discussion of this issue is not necessary to a determination of the motion for summary judgment. The court will nonetheless dispose of this issue.

 Heller argues that the term "in all returned and repossessed goods" contained in the security agreement grants a security interest in inventory. It must be noted that these words are followed with the words "arising therefrom or relating thereto." These latter words clearly indicate an intention to grant a security interest in all returned or repossessed goods relating to accounts receivable and contract rights. Thus if Summit sells goods on credit Heller is granted a security interest in the account receivable arising therefrom and is also granted a security interest in the goods covered by such a sale if they are returned by the purchaser or if they are repossessed by Summit. This provision offers protection to Heller in the collection of the account receivable. The language regarding returned or repossessed goods cannot be stretched to include inventory held by Summit which is returned by it or repossessed from it. Such a return or a repossession would have no relationship to any account or contract right owing to Summit.

 UCC §§ 9–106 and 9–109 provide for six major categories of collateral, these being accounts, general intangibles, consumer goods, equipment, farm products and inventory. It is evident that Heller was aware of the distinction between accounts and inventory since it used both terms in the financing statements. It is correct that the UCC does not require the use of the specific term "inventory" so long as there is an adequate description of the collateral. However in the present case there is no language in the original security agreement indicating any intent to grant a security interest in inventory. As a result if Bendix properly exercised its right to reclaim the goods, Bendix would have taken the goods free and clear of any claim to them by Heller, except for the grant of a security interest to Heller contained in the amendments to the financing statements.

## NOTICE OF RECLAMATION

The trustee and Heller contend that Bendix did not comply with the requirements of the UCC regarding the reclamation of goods. Because the court has found that the amendments to the financing statements fulfilled the requirements of a security agreement and gave a perfected security interest to Heller in inventory and therefore in the goods in question and the court has found that the security interest of Heller takes precedence over the rights of the reclaiming seller, Bendix, it is not essential that the court determine whether Bendix complied with the requirements of the UCC regarding reclamation of goods. Nevertheless the court will dispose of this issue.

The trustee and Heller contend that the telegram sent by Bendix did not constitute a notice of reclamation and that the telegram, instead of being addressed to Summit, was addressed to Lon Bryant, the attorney for Summit, whom they contend was not authorized to receive such a notice.

The telegram reads as follows:

"Efforts to contact you or your client, Summit Creek Plywood Co. unsuccessful. Word of your client's [sic] insolvency forced stoppage with carrier of delivery of goods under summit order No. 493, 548, 558, 559, 591 and 592, persuant [sic] to UCC Section 2705. If wish to deal on cash basis, contact me at 415–929–6097. Nancy M. Cohen, assistant general counsel, American Forest Products Corp (PO Box 3498 San Francisco Ca 94119"

ORS 72.7020 provides:

"(1) Where the seller discovers the buyer to be insolvent, he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under ORS 72.7050.

"(2) When the seller discovers that the buyer has received goods on credit while insolvent, he may reclaim the goods upon demand made within ten days after the receipt..."

ORS 71.2010(26) provides:

"A person "notifies" or "gives" notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it."

The effect of ORS 72.7050 is to permit the seller to stop goods in transit until the goods are received by the purchaser or the equivalent of receipt has occurred, acknowledgement by a bailee or a carrier or negotiation of a negotiable document of title. The right of reclamation provided by 72.7020 arises upon receipt of the goods by the buyer. Whether the seller asserts a right to stop in transit or a right to reclaim the goods, the effect is the same, i.e. a rescission of the sale by the seller. Stoppage in transit is accomplished by notice to the party in possession of the goods, i.e. the bailee or the carrier. Since reclamation does not become applicable until delivery to the purchaser or exercise of dominion over the goods by the purchaser through a re-shipment, notice of reclamation is to be given to the purchaser.

ORS 71.2010(26) does not prescribe any formal requirements for a notice but merely requires that the person giving the notice take such steps as may be reasonably required to inform the other. This section does not require that the notice state the provision of the UCC upon which the seller is relying, whether the notice is one to stop in transit or to reclaim goods already delivered. The notice, in the case of reclamation, should be sufficient if it reflects an intention on the part of the seller to rescind the sale. Due to the short period of time within which the seller has to act, it would be unreasonable to require the seller, at his peril, to first determine whether the goods have been received by the purchaser or are still in the actual possession of a carrier before giving notice of recission of the sale.

In this case the telegram clearly notifies the buyer of the seller's rescission of the sale. The fact that the notice referred to that section of the UCC dealing with the right of stoppage in transit should not be held to modify or limit the seller's clear indication that the sale was being rescinded. The court therefor concludes that the telegram was sufficient to comply with the notice requirements of ORS 72.-7020.

The next question is whether the notice was directed to an appropriate person. There is some conflict in the evidence as to whether Lon Bryant, the person to whom the telegram was sent and who received it, was then the attorney for Summit with the authority to receive such notice. This misses the point. It is not necessary for the court to find, in order to conclude that the notice complied with the requirements of ORS 72.7020, that the notice was addressed to an agent authorized by the buyer to accept such a notice. All that ORS 71.2010(26) requires is " * * * taking such steps as may reasonably be required to inform the other in the ordinary course * *." It was reasonable for Bendix, when it learned that Summit's office was not being manned, to send the notice to Lon Bryant, whom it knew had been acting as the attorney for Summit. Under the circumstances it was reasonable for Bendix to conclude that notification to Bryant was more likely to result in knowledge by the officers of Summit than would a notice addressed to the office of Summit. The court therefore concludes that the telegram addressed to and received by Bryant fulfilled the notice requirements of ORS 72.7020 and ORS 71.-2010(26).

This memorandum opinion shall constitute findings and conclusions under Bankruptcy Rule 752.