In re WATHEN'S ELEVATORS, INC., Debtor.

HARRIS TRUST AND SAVINGS BANK, Plaintiff,

v.

WATHEN'S ELEVATORS, INC., et al., Defendants.

Bankruptcy No. 48200196.
Adv. No. 4820075.

United States Bankruptcy Court,
W.D. Kentucky.

Sept. 13, 1983.

James M. Breen, Chicago, Ill., George S. Wilson, III, Owensboro, Ky., for plaintiff, Harris Trust.

Morton Holbrook, Michael A. Fiorella, Owensboro, Ky., for Wathen's Elevators.

Henry H. Dickinson, Glasgow, Ky., trustee for bankrupt estate.

Joseph E. Ternes, Jr., Henderson, Ky., Thomas A. Blandford, Moss-Miller, Inc., Willie McLar, Ronald Bamberger, Owens-boro, Ky., for unsecured creditors' committee.

William L. Sullivan, John Dorsey, Henderson, Ky., for Addison, Posey et al.

John Scott McGaw, Wendell Holloway, Madisonville, Ky., for defendant, Boarman Bros.

Ronald G. Sheffer, Henderson, Ky., for defendant, Grossman Bros. Farms.

Thomas E. Neal, Owensboro, Ky., for S.S. Wathen estate.

J. Quentin Wesley, Morganfield, Ky., for defendants: Sprague Bros., Mitchell Bros. Seed, Chas. & Dottie O'Nan, Billy Don Greenwell, d/b/a Greenwell Bros., Robin Rhea, d/b/a Rhea Farms, Larry Buckman, P.W. Loveland, Reynolds Alum., James Skinner.

Kirby Gordon, II, Owensboro, Ky., for defendant, SLT Warehouse.

Sidney H. Hulette, Morganfield, Ky., for Steve Anderson Farms, et al.

Terry G. Farmer, Evansville, Ind., for Bob and Glen Apple d/b/a Apple Farms and Harley Disque.

## REPORT OF THE SPECIAL MASTER

TO: THE HONORABLE EDWARD H. JOHNSTONE:

The undersigned is United States Bankruptcy Judge and duly appointed Special Master in this proceeding by order of court dated April 13, 1983. The Special Master's charge, pursuant to the Emergency Rule of the District Court of December 22, 1982, was to tender proposed findings of fact and conclusions of law upon which the District Court, acting as court of original bankruptcy jurisdiction, can base a resulting order. They are herewith respectfully submitted.

This proceeding is the first in which a sitting Bankruptcy Judge has also been appointed Special Master, and there is therefore no traditional form for reports such as this one.

There are at least two forms in which special masters and commissioners in state and federal courts, (and even some judges),

cast their "findings of fact and conclusions of law."

One form commonly used in state courts is a rather mechanistic presentation of (a) findings of fact, and (b) conclusions of law, established as separate literary components, with each category containing a highly specific, usually numerically designated series of statements and applied legal rules, from among which presumably the reviewing court may pick and choose.

The other form is the simple legal essay, rather typical of published judicial opinions, which consists of a single organic document interstitially weaving together the facts and the law for the sake of reader attention and persuasion.

We have chosen the latter form. The relative complexity and sophistication of the litigation at hand does not lend itself to the neatly compartmentalized fact-finding and reasoning of the "laundry list" approach. We strain, as it is, for safe passage through the rocks and shoals between two monolithic and arcane code structures, the Uniform Commercial Code and the Bankruptcy Code. We have made a conscious choice between specificity and comprehension. Even in essay form, the subject of the work is difficult enough to understand.

Despite that disclaimer, however, our writings similar in form to the following "Memorandum Opinion" have been found adequate—at least as to form—to satisfy the appellate review requirement of "findings of fact and conclusions of law."

The signature below indicates acceptance of sole responsibility for the content and analysis contained in the following Memorandum Opinion. The following is of course subject to acceptance, amendment or rejection, in whole or in part, at the pleasure of the District Court.

## MEMORANDUM OPINION

This class action seeks a declaratory judgment of the priorities of payment between the unpaid sellers of grain to a bankrupt elevator and a bank holding a prior security interest in the same grain. At issue is entitlement to the proceeds from grain sold under court order, $1,426,651.95.

The plaintiff in this action is the secured bank, Harris Trust and Savings Bank of Chicago, claiming under a 1979 security agreement with an after-acquired property clause. The defendant class represents the farmers who sold grain to Wathen's Elevators, Inc., as yet unpaid, who assert state statutory rights to reclaim the cash equivalent of the grain. The scope of this class litigation is significant; the Wathen bankruptcy schedules list 378 purchase contracts with 330 unpaid farmers. We certified the class on January 20, 1983 and by this order will make disposition of virtually all of those claims.[1]

The manner in which this dispute reaches us can be briefly described. Wathen's Elevators, Inc., filed a Chapter 11 reorganization petition on May 12, 1982. The preceding month the District Court, ruling in an action involving the same substantive rights we now address, had ordered the perishable grain sold and the proceeds held by Harris until the conflicting rights were adjudicated.

The senior pending action was transferred to the Bankruptcy Court in April, 1982, after the filing of this complaint, to avoid essentially duplicative litigation. The bank promptly moved for partial summary judgment.

Thereafter, because of the jurisdictional lapse created by the Supreme Court opinion in *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the District Court reassumed primary jurisdiction; the undersigned Bankruptcy Judge was appointed Special Master in this proceeding, and has formulated the findings of fact and conclusions of law contained in this opinion.

1. The present ruling disposes of $1,387,003.62 of those proceeds. It does not determine the validity of a March 11, 1982 warehouse receipt issued to Harris or the related disposition of $39,648.33, the net proceeds of an apparent overage inventory of wheat and yellow corn; the plaintiff bank has not sought a determination of this one transaction.

The bank's motion for partial summary judgment addresses two central issues: (1) whether a right of reclamation exists for the class or any of its members, and (2) the effect upon those reclamation rights, if any, of the prior security interest held by the bank. The answers to these questions require an analysis of the nature of the transactions that occurred—and there were several different types—and the status and rights of the parties to them, the elevator, the farmers and the bank.

## I. NATURE OF THE PARTIES AND THEIR CONTRACTS.

### A. *Wathen's Elevators, Inc.*

Wathen's Elevators, Inc. is a grain dealership that purchases grain for resale. It is not, strictly speaking, engaged in the grain storage business; that is, it does not act as a commercial bailee for grain producers who choose to store grain at a central elevator, are given a warehouse receipt, pay storage fees, and can demand return of their grain at any time.[2] If Wathen were a mere bailee our inquiry would be greatly simplified. In the bailment situation, title to the grain always resides in the bailor, the farmer, and never passes to the elevator bailee. At distribution, bailed property is simply returned.[3]

As a grain merchandiser, Wathen entered into three types of purchase transactions with producing farmers. (1) *Cash sales* occurred when delivery, establishment of the price, and payment to the farmer occurred simultaneously, and were mutually dependent events. (2) Wathen and grain producers utilized some type of *credit sales* most frequently. In these sales, goods were delivered to the buyer, but there was a time lag between delivery of possession and payment of the price. This category includes *deferred payment contracts,* in which the price was established at time of delivery but payment deferred to a later date, and *deferred pricing contracts,* in which grain was delivered but the seller had a certain period of time within which to establish a price based on market activity. (3) Finally, Wathen and some farmers entered into *contracts to sell.* Under this form of agreement, price was established at the time of the contract, but delivery was made due at some point in the future. The farmer is to be paid upon delivery in this type of contract, which makes it a hybrid variety of a cash sale.[4]

As the buyer in a series of grain purchases until March 8, 1982, Wathen had significant rights in that grain.[5] It obtained a "special property and an insurable interest" when the goods were identified as intended for the elevator, that is, upon contract formation for cash or credit sales and upon crop planting in a contract to sell.[6] Additionally, actual possession and title both passed to the elevator upon delivery by the seller.[7] It was these property rights

---

2. *Bankruptcy Reform Act of 1978 (Grain Elevator Insolvencies): Hearings on S. 839 Before the Subcomm. on Courts of the Senate Committee on the Judiciary,* 97th Cong., 1st Sess (1981) (statement of Wallace Dick, Director, Iowa State Commerce Commission pp. 105–9).

3. 4 Collier on Bankruptcy ¶ 725.01 (15th Ed. 1980).

4. For an overview of elevator operations and the types of contracts they employ, see, Note, A Survey of Current Issues and Legislation Concerning Grain Elevator Insolvencies, 8 J.Corp.L. 117–30 (1982).

5. Counsel for the sellers argues that Wathen's status is that of a converter and that good title could not pass to Harris. Conversion occurs when one wrongfully interferes with the rights of the true owner to the possession of his property. This interference must be so substantial as to justify treatment as a forced sale. Wathen may not accurately be characterized as a converter of the grain housed in the elevator for a very simple reason. Pursuant to a contract of sale, whose validity has not been challenged, the farmers sold and delivered goods to Wathen. Because most chose to defer their compensation and select a price in the future, they were awaiting funds from Wathen. Nevertheless, once they sold their grain they were no longer the true owner.

6. KRS 355.2–501.

7. KRS 355.2–106(1) defines a sale as the passing of title to goods, but refers to 2–401 for the timing of that passage. The latter section states that title passes at the time and place at which the seller completes his physical delivery unless explicitly agreed otherwise.

which enabled Wathen to give a security interest to its lender in exchange for a line of credit.

We note, at this point, that Wathen's title was voidable.[8] As a nonpaying buyer in default and insolvent at the time of purchase, Wathen received title subject to avoidance by the seller. The voidable nature of the title, however, as will be seen, plays no part in our determination today.

Faced with payment refusals and dishonored checks, it became clear to the farmers that the elevator was insolvent. Beginning on March 11, 1982, a total of seven separate civil actions were filed by various groupings of these farmers seeking a temporary restraining order against Wathen and return of the grain. On March 19 Harris demanded payment in full of Wathen's line of credit. On April 5 the elevator's inventory was sold pursuant to district court order.

Wathen filed a Chapter 11 reorganization petition on May 12, 1982. Four months later the debtor in possession was replaced by a trustee, who presently protects the rights of Wathen. He is not an active party in this dispute.

### B. *Farmer-Sellers of Grain.*

The most distraught members of this triadic relationship are those in the certified seller class, which we note is not a purely homogeneous class in terms of transactional analysis. Although all of the class members are unpaid sellers, some participated in cash transactions, while a majority sold on credit.

This transactional dichotomy is, however, more apparent than real, and does not in any way obstruct our analysis. We have examined the rights of both types of sellers, each independently of the other. In the end, however, all are treated similarly for the purposes of this litigation. As we noted when certifying this class, there are questions of law common to the class.

■ Because we deal with transactions in goods, Article Two of the UCC governs the rights of these sellers, cash or credit. All of these litigants are seeking identical relief, reclamation of their goods.[9] Section 546(c) of the Bankruptcy Code also recognizes such a right.

Reclamation is the automatic right to repossess goods delivered to a nonpaying buyer. This is vendor protection to an extraordinary degree—it allows a seller to swoop down and pluck his particular goods from the hands of the buyer and other grasping creditors. It is a very practical marketplace remedy, but because of the potential for abuse of the immediate possessory rights it confers, it is statutorily circumscribed.

Although the Bankruptcy Code permits reclamation, it does not indicate who may exercise the power; the Code addresses itself to specifying the procedures that a "reclaiming seller" must follow.[10] We therefore turn to the UCC as the wellspring of this legal right, and for an indication of who may qualify as a reclaimant.

At this point we will bifurcate the seller class into cash and credit sellers and explain the rights of each subclass. Arriving at a similar statutory settlement, we will then reunite the class to apply the controlling law.

---

**8.** The sellers similarly characterize Wathen's title, but erroneously conclude that this precludes passage of indefeasible title.

**9.** Counsel for the sellers offers a recent Kentucky statute as an alternative basis of relief, but we decline the offer. KRS 427.180 specifies that "(a) claimant's production to a bankruptcy court of a grain *storage* receipt or scale ticket as evidence of ownership of a quantity of grain held by the trustee shall be sufficient to establish a prima facie claim of right to possession...." (emphasis added). This court is not bound by the dictates of this statute for two reasons. First, its effective date was July 15,

1982, after this bankruptcy dispute arose. Secondly, the protected class is farmers who use an elevator for storage purposes; it does not apply to a farmer who sells his grain, for a price, to a grain merchandising operation, such as Wathen.

**10.** The legislative history of Section 546(c) indicates that it is meant to apply to both credit and cash sales. See 124 Cong.Rec.S. 17, 413–14 (daily ed. Oct. 5, 1978) (Statement by Sen. DeConcini); 124 Cong.Rec.H. 11, 097 (daily ed. Sept. 28, 1978) (Statement by Rep. Edwards).

1. *Cash Sales.* The general remedies available to a cash seller are enumerated in Section 2–703 of the UCC. Only two of the available alternatives are meaningful once delivery has occurred: (1) recapture the goods, resell them and recover damages for any resulting loss, or (2) sue on the contract price. If the alternative of resale is to have any legal significance, a right of reclamation must exist. Implicit support for this commonsense conclusion is found by a combined reading of UCC Sections 2–507 and 2–511.

■ In a cash transaction a buyer may not retain or dispose of the seller's goods until he makes the payment due. (2–507). Payment by check is conditional and the buyer's rights are defeated if his check is dishonored. (2–511). Cumulatively read, these sections implicitly permit the cash seller to reclaim his goods if the buyer refuses to pay upon demand or if his draft is not accepted by the bank.

It is precisely this metamorphic reasoning which has resulted in the judicial recognition of rights of reclamation for cash sellers, although the UCC is silent on the privilege.[11] And it is on this statutory basis that we will examine the claims of cash sellers to determine if they have properly asserted their reclamation claim.

2. *Credit Sales.* Turning next to the credit sellers, we note that the UCC more certainly and directly confers reclamation rights on this group, but only because of the buyer's status.

■ Our examination of the record indicates that, to a man, these sellers delivered grain to Wathen, received a promise of payment at a future date, and nothing more. Under these circumstances, we conclude that the credit extended was unsecured. These sellers did not obtain an enforceable security interest in the goods delivered, which was the protective avenue permissible under Section 2–401 of the UCC. Consequently, they simply have Wathen's promise as the basis of their claim.

■ Although these sellers tendered "*conforming goods*" within the meaning of the UCC and the buyer defaulted in its payment obligation, because of the sellers' unsecured status they generally would be limited to an action for the price of the goods,[12] and could not successfully demand their return. However, because these open-credit sellers dealt with an insolvent buyer, they clearly have an additional legal right, reclamation as provided by Sec. 2–702(2) of the UCC.

C. *Harris Trust & Savings Bank*

The final actor before us is Harris, the secured creditor, holding a security interest dated October 10, 1979. Wathen entered into an arrangement with the bank to obtain working capital to make cash payments for grain deliveries. Specifically Harris granted Wathen a $2 million line of credit and, as collateral for its commitment, executed and perfected a valid security interest in Wathen's grain inventory.[13] The security agreement created a "floating lien", making all of Wathen's present or after-acquired inventory subject to Harris' security interest.

---

11. For courts which have recognized cash reclamation claims see *Burk v. Emmick* 637 F.2d 1172 (8th Cir.1980); *Szabo v. Vinton,* 630 F.2d 1 (1st Cir.1980); *Sorrels v. Texas Bank & Trust,* 597 F.2d 997 (5th Cir.1979); *In re Helms Veneer Corp.,* 287 F.Supp. 840 (W.D.Va.1968).

12. KRS 355.2–709. Section 2–703 remedies are not available because none of the necessary events (wrongful rejection, revocation of acceptance, or failure to make a payment due on or before delivery) have occurred.

13. The Harris-Wathen security agreement contained the three enforceability requirements: a writing, Wathen's signature, and a description of the collateral. KRS 355.9–203(1)(b). The security interest attached and was enforceable against Wathen because of the co-existence of: the written agreement; value given in the form of a $2,000,000 line of credit by the bank; and, rights in the collateral obtained by the debtor upon identification (2–501) and delivery (2–401) of the goods. KRS 355.9–204(1). Finally, the security interest was properly filed and thereby perfected, making it enforceable against third parties. KRS 355.9–401(1)(c); .9–302.

■ Although the bank is a secured party, we are not concerned in this case with its priority or standing within the ranks of other secured creditors. We deal only with the priorities as between the unpaid sellers and the secured creditor.[14] In the context of these sales we turn to Article Two of the UCC for guidance.[15] Based on provisions of this statute as adopted in Kentucky,[16] we conclude that Harris enjoys the status of a good-faith purchaser.

■ Incorporating the principle of voidable title, Section 2–403 of the UCC gives a transferor (Wathen) the power to pass good title to certain transferees (Harris) although the transferor himself does not possess good title. This power is not limited to cash transferees, but is granted to good-faith "purchasers" for value.

The key term "purchasers" is broadly defined in the UCC to include persons who take by sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property.[17] A binding commitment to extend credit or to extend a pre-existing indebtedness, accepting delivery under a pre-existing contract, or any other consideration sufficient to support a simple contract, all may constitute value.[18]

■ Harris, as a secured creditor, entered this large "purchaser" class, by UCC definition, in two ways. A security interest granted in inventory can be accurately described both as a "mortgage" and a "voluntary transaction creating an interest in property." The bank's binding commitment in 1979 to extend new credit or to extend Wathen's pre-existing indebtedness constituted the necessary value. Following the letter of the UCC, then, Harris, the secured creditor, is a "purchaser for value" who can receive good title despite Wathen's voidable title.[19]

14. The sellers in this dispute seek to assert a right to reclaim their goods pursuant to UCC 2–702. This is right distinct and different from the interest in property possible via a security interest. The reclamation privilege is not possible via a security interest. The reclamation privilege is not just an unperfected security interest; it is potentially a much more powerful weapon. *See In re Mel Golde Shoes,* 403 F.2d 658, 660 (6th Cir.1968); *In the Matter of Federal's Inc.,* 553 F.2d 509 (6th Cir.1977).

15. *In re Mel Golde Shoes,* supra, is a reclamation case from our own Sixth Circuit, which determined the respective rights of unpaid sellers and a creditor asserting an attachment lien which arose *after* the delivery date. The present dispute is factually distinguishable, as we deal with reclaiming sellers and a creditor holding a properly perfected *prior* security interest in the debtor's inventory. Therefore, the rule developed in *Mel Golde* does not control this case.

16. Various members of the seller class have argued that this case presents a conflict of laws question, and that the law of Illinois should control the status of Harris because the security agreement provided that it would be governed by the laws of Illinois. Section 1–105(1) of the UCC only permits parties to choose a system of laws to govern their rights and duties. The stipulation in the security agreement is controlling only for disputes between the bank and the elevator. These two parties cannot dictate the controlling law for ancillary disputes, such as this one, which involves the rights of third parties.

Additionally, the reclaiming sellers are asserting statutory rights as defined by Kentucky law. They must be judged using Kentucky standards, not an Illinois import. The Sixth Circuit has recently settled this conflict-of-laws point. *See Harris Corp. v. Comair, Inc., et al.,* 712 F.2d 1069 (6th Cir.1983). Analytically speaking the Illinois and Kentucky statutes are indistinguishable. Our pivotal point is whether a secured creditor may qualify as a good faith purchaser with rights superior to a reclaimant. Both statutes contain this crucial category; the absence of presence of the lien creditor phraseology, of concern to sellers' counsel, is of no moment.

17. KRS 355.1–201(33)(32).

18. KRS 355.1–201(44).

19. For cases in which a secured creditor was held to be a "purchaser for value," see *In re Summit Creek Plywood Co., Inc.,* 27 B.R. 209 (D.Or.1982); *In the matter of McLouth Steel Corp.,* 22 B.R. 722 (E.D.Mich.1982); *In re Western Farmers Ass'n,* 6 B.R. 432 (W.D.Wash. 1980); *Los Angeles Paper Bag Co. v. James Talcott, Inc.,* 604 F.2d 38 (9th Cir.1979); *Kennett-Murray Co. v. Pawnee National Bank,* 26 UCCRS 686 (Ct.App.Ok.1979); *In re Bowman,* 25 UCCRS 738 (N.D.Ga.1978); *In the Matter of Samuels & Co.,* 526 F.2d 1238 (5th Cir.), *cert. denied, Stowers v. Mahon,* 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976); *In re Daley,*

Section 2–403 also requires a purchaser to act in good faith to ensure an unassailable title. It mandates honesty in fact in commercial conduct.[20] In order to meet this standard, Harris must have displayed reasonable commercial standards of fair dealing.[21]

Relying on principles of agency law, the sellers dispute the bank's good faith on the ground that the records and constant contact of the local agent bank[22] made it an integral part of the financing of the elevator and aware of Wathen's operations and financial status. To the local bank a kind of "insider" status is thus attributed, with the resulting guilty knowledge imputed to its correspondent bank, Harris. Counsel for the farmers constructs the following argument:

Money was wired daily, either by the grain purchaser or by Harris, to the agent bank to cover Wathen's charges. Beginning in mid-January, 1982, not all of the funds advanced to Wathen were properly deposited. Consequently, the elevator's account was continuously overdrawn. Yet the agent bank "continued to actively participate in the banking scenerio of covering the shortage of checks."[23] Counsel concludes that Harris cannot claim good-faith status because its agent actively participated in the elevator's financial operations and had notice and knowledge of Wathen's shortages.

There are at least three vulnerable points in this line of attack. First, counsel has selected an improper timeframe in stressing the events of March, 1982. Harris' conduct in 1979 in establishing the line of credit is unquestioned, yet it was the 1979 dealings which were determinative of Harris' essential "purchaser" characteristics. In this initial transfer Harris obtained a later inviolable security interest. Subsequent "purchases" involved no purposeful conduct by the bank, but were automatic occurrences, triggered into being by the after-acquired property clause in the original agreement. The bank's "floating lien" was floating no longer, but was anchored firmly in place and fully operative in early 1982. It cannot be said to have affected the farmers' decision to sell, or not to sell, grain to the elevator. Moreover, Harris' security interest was a public record and therefore discoverable by the sellers.

Second, even if 1982 facts have any bearing on a 1979 corporate state of mind, we find no facts which indicate any improper conduct by Harris. The dramatic allegations contained in counsel's argument appear to be just that. Neither the local bank president's deposition nor that of Wathen's accountant in any way factually substantiate the assertion that the local bank knew of, or was in any way involved in, any type of fraudulent scheme. The president's testimony does not contain any factual support whatsoever for the agency theory which underpins the criticism of Harris' good faith. Therefore, no material issue of fact exists, based on the extent of discovery which has been had in this case, which would preclude summary judgment on Harris' good faith status.

Finally, even if we accept counsel's version of the Wathen-local bank-Harris relationship, it does not detract from the good faith stature that Harris had acquired in 1979. Article Two of the UCC requires only honesty and reasonable commercial standards from purchasers.[24] Nowhere in that Article is it demanded that purchasers be ignorant of other dealings by their seller. Indeed, even Article Nine of the UCC,

---

*Inc.,* 17 UCCRS 433 (D.Mass.1975); *First-Citizens Bank & Trust Co. v. Academic Archives, Inc.,* 8 UCCRS 1197 (Ct.App.N.C.1971); *In re Haywood Woolen Co.,* 3 UCCRS 1107 (D.Mass. 1967).

**20.** KRS 355.1–201(19).

**21.** *In re Samuels,* supra at pp. 1243–44; *In re Bowman,* supra at p. 743.

**22.** The First National Bank of Henderson is the agent bank.

**23.** Boarman, Gilles, Payne and Gregory Memorandum in Response to Motion of Harris for Partial Summary Judgment, p. 23.

**24.** *See* note 20 supra.

which defines secured transactions and regulates conflicts among creditors, does not require that the first priority creditor be without knowledge of other interests; rather, priorities are determined on the basis of a filing structure, and knowledge is irrelevant.[25]

Therefore, with other courts that have decided the question on analogous facts,[26] we conclude that Harris qualifies as a good faith purchaser. As such, its rights are statutorily defined depending on the circumstances of the commercial transaction. In general, however, the UCC affords priority treatment to such purchasers because they are wholly innocent parties,[27] and Harris qualifies for their ranks.

## II. RECLAMATION RIGHTS ANALYZED

### A. Under the UCC

■ Although the UCC's reclamation prerogative is a powerful remedy, it is also procedurally circumscribed, and must be exercised in precisely the manner outlined. If a seller fails for any reason to come within the purview of the statute, he loses the right to reclaim his property,[28] and stands in line as an unsecured creditor.

■ Reclamation under the UCC requires an insolvent buyer and either (1) a written misrepresentation of solvency made to the seller within three months before delivery, or (2) a demand for the goods within ten days of their receipt by the buyer.[29]

■ Counsel for the sellers attempts to circumvent the ten-day limitation by arguing that the prior misrepresentation exception is applicable here. We are presented with a potpourri of purchase contracts, scale tickets, grain settlement records, and dishonored checks. We see no probative value to the array of commercial records. The grain contract proffered is a written agreement between buyer and seller regarding an exchange of goods and money; a financial appraisal of the buyer is not part of this promissory document. Secondly, neither the scale tickets nor the grain settlement records contain any assertions regarding the buyer's financial health. We have examined these papers and find them to contain simply details of delivery: gross and net weight, net bushels, moisture content, damage, grain held on account, etc. Finally, delivery receipts and checks issued by the buyer could not have been prior misrepresentations of solvency because they were issued after delivery.[30] Dismissing the prior misrepresentation exception, we conclude that the ten-day demand requirement is applicable to these reclaiming sellers.

### B. Under the Bankruptcy Code

■ The Bankruptcy Code also imposes the additional procedural hurdle to a reclamation demand, that the demand be in writing. Thus, a written demand for re-

---

**25.** KRS 355.9–312.

**26.** See note 19 supra.

**27.** See e.g. UCC §§ 2–403, 3–302, 3–305, 6–110, 7–501, 7–502, 8–301, 8–302, 9–307, 9–309.

**28.** In re Landy Beef Co., Inc., 30 B.R. 19 (D.Mass.1983); In re HRT Industries, Inc., 29 B.R. 861 (S.D.N.Y.1983); In re Tom Woods Used Cars, Inc., 24 B.R. 529 (E.D.Tenn.1982); Matter of Deephouse Equipment Co., Inc., 22 B.R. 255 (D.Conn.1982); In re Koro Corp., 20 B.R. 241 (1st Cir.1982); In re Ateco Equipment, Inc., 18 B.R. 917, (W.D.Pa.1982); In re Contract Interiors, Inc., 14 B.R. 670 (E.D.Mich. 1981); In re Original Auto Parts Distributors, 9 B.R. 469 (S.D.N.Y.1981).

**29.** Those courts allowing cash reclamation under Section 2–507 have also required the 2–702 ten-day demand. See Szabo v. Vinton, supra at 4; Sorrels v. Texas Bank & Trust, supra at 1000; In re Helms Veneer Corp., supra at 846; In re Koro Corp., supra at 243. But see Burk v. Emmick, 637 F.2d 1172 (8th Cir.1980). (This case involved a dispute between the seller and the defaulting buyer that was not controlled by UCC § 2–702. The Court noted that the buyer did not forcefully oppose the seller's right to reclaim, but contested his right to recover a deficiency judgment, and held that the seller's reclamation must only be within a reasonable time.)

**30.** In re Creative Buildings, Inc., 498 F.2d 1 (7th Cir.1974).

turn of grain within ten days of its receipt by Wathen is a condition precedent for every member of the seller class. Although both Codes insist on a written ten-day demand, neither provides any insight as to its form or substance.

These reclaimants put Wathen on notice in three different ways when they perceived the imminent collapse of the elevator operation: Many orally insisted on the return of their grain; some wrote demand letters to Wathen, and 78 farmers instituted state court proceedings to accomplish the return of the grain.

The writing required by the Bankruptcy Code serves as proof that the buyer has been given definite notice that the seller intends to exercise his exceptional statutory right.[31] Clearly any letter to Wathen based on the reclamation statute would be sufficient notice. Similarly, Wathen would have definite notice by service of any complaint seeking return of the grain; there are few more forceful forms of written notice than the civil summons. For purposes of the present motion, we will consider both demand letters *and* the commencement of civil litigation as within the "written demand" requirement of Section 546(c) of the Bankruptcy Code.

Our correlation of grain delivery dates and written demand dates yields only eight class members who timely sought reclamation.[32] Other class members who did not

promptly pursue that statutory remedy necessarily lost the privilege.[33]

## III.  CONCLUSION

Thus we recognize that a right of reclamation may properly be asserted by only eight members of the defendant class. But even theirs may be a Pyrrhic victory only, in view of the balance of reclamation law.

██ Under the terms of both the UCC and the Bankruptcy Code the protection extended is in large degree self-neutralizing, prompting one commentator to label reclamation as a "mission impossible."[34] By relying on the reclamation provisions of these two statutes, these sellers *could* prevail over both the buyer in default and the trustee in bankruptcy. But even the eight reclaimants who met the ten-day written notice requirement must bow to good faith purchasers,[35] among whose number we have already counted Harris.

Section 2–702(3) of the UCC expressly makes the right to reclaim "subject to the rights of . . . (a) good faith purchaser. . . ." Section 2–511 of the UCC comments that the rights of bona fide purchasers are not disturbed. Section 546(c) of the Bankruptcy Code indicates that the bankruptcy right is "subject to any superior rights of secured creditors."

The limitations discussed above are compatible with the underlying philosophy of

**31.** Section 546 does not contain any explanation of why a ten-day demand must be made; neither does the legislative history provide its justification. Only one reported case, *In re Samuels,* supra, grapples with this issue unsuccessfully, and concludes that the notice must serve some function other than notifying third-party takers. The ten-day limit seems, at best, arbitrary.

**32.** The following eight class members have properly asserted a reclamation claim for those goods delivered ten days prior to their demand: Mrs. Herman Alvey, Boarman Brothers, Robert Alvey, Double E Farms, Luckett and Stewart, Maloney Farms, Jerry & George Thompson, Weldon & Berry.

**33.** *In re. HRT Industries, Inc.,* supra at 865; *Matter of Deephouse Equipment Co., Inc.,* supra at 258–259; *In re Koro Corp.,* supra at 128;

*In re Original Auto Parts Distributors,* supra at 471; *Kennett-Murray Co. v. Pawnee National Bank,* supra at 690.

**34.** Siegal, "Reclamation From an Insolvent Vendee—Mission Impossible," 9 U.C.C.L.J. 27 (1976, advises all sellers to take and perfect a purchase money security interest in the goods they sell.

**35.** *In re Summit Creek Plywood, Inc.,* supra at 212; *In the Matter of McLough Steel Corp.,* supra at 725; *In re Western Farmers Ass'n.,* supra at 436, *Los Angeles Paper Bag Co. v. James Talcott, Inc.,* supra at 39–40; *Kennett-Murray Co. v. Pawnee National Bank,* supra at 690, *In re Bowman,* supra at 742; *In re Samuels,* supra at 1241; *In re Daley, Inc.,* supra at 434; *First Citizens Bank & Trust Co. v. Academic Archives, Inc.* supra at 1201; *In re Hayward Woolen Co.,* supra at 1111–12.

the UCC. As we have noted, third party purchasers are favored parties because of their innocence. The UCC cannot allow a seller to abrogate a completed sale and repossess his goods after they have been transferred to a third party, which would constitute a preference to the seller over the innocent purchaser. Rather than to promote the reactive and commercially disruptive conduct of reclamation, the UCC presents the seller the possibility of complete protection through a different medium, the purchase money security interest.[36]

However, to say that reclamation is "subject to" superior claims is neither to deny the validity of the sellers' rights nor to bar their claims. Rather the effect of this language is to eliminate their first position and relegate the sellers to some less commanding station.

■ Providently, the Bankruptcy Code does not leave unattended those eight parties whose reclamation rights were properly preserved. Section 546(c) does offer some limited protection to these claimants. When reclamation is denied to a seller with an otherwise valid right—where, for example, as here, the goods were subject to a senior secured claim—the court may do so only by granting that seller an alternative form of relief. The statute contemplates the replacement of reclamation by a lien equal in value and effectiveness to the right of reclamation at the time it was asserted.

Following the statutory guidelines then, we hold that those eight parties with valid reclamation claims should be granted a lien on the assets of the estate pursuant to Section 546(c)(2)(B). This lien, of course, would be junior to any remaining unpaid claim of Harris that is protected by its prior security interest. As to where the resulting lien would stand in seniority among other lien claimants against the Wathen estate, and as to its exact amount, those matters should be left to the Bankruptcy Court to decide in the future.

As to all other sellers in the class whose reclamation rights were not properly assert-

ed along the lines of analysis contained in this opinion, reclamation must necessarily be denied.

This opinion constitutes our findings of fact and conclusions of law within the meaning of Section (d)(3)(B) of the Emergency Resolution of the District Court for the Western District of Kentucky of December 22, 1982.

/s/ Merritt S. Deitz, Jr.
MERRITT S. DEITZ, JR.
Bankruptcy Judge and
Special Master

**36.** A purchase money security interest defeats even prior liens. KRS 355.9–312.