## In re WATHEN'S ELEVATORS, INC., Debtor.

## Henry H. DICKINSON, Plaintiff,

v.

## Thomas MEREDITH, Defendant.

Bankruptcy No. 48200196.
Adv. No. 4830062.

United States Bankruptcy Court,
W.D. Kentucky.

March 8, 1984.

Henry H. Dickinson, Glasgow, Ky., Trustee for the Estate of Wathen's Elevators, Inc.

Ronald J. Bamberger, Owensboro, Ky., for trustee.

William Stephen Reisz, Louisville, Ky., for defendant.

Sandra D. Freeburger, Sebree, Ky., amicus curiae.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

This is a prototype preference action arising in the aftermath of the collapse of Wathen's Elevators, Inc., which filed for reorganization under Chapter 11 on May 12, 1982. Although we deal with a payment made February 23, 1982, to a single farmer, we necessarily fashion a rule of law that may control the disposition of payments made to several farmers just prior to the bankruptcy.

Section 547(b) of the Bankruptcy Code permits trustee avoidance of prepetition transfers which are: (1) to or for the benefit of a creditor; (2) on account of an antecedent debt; (3) made while the debtor

is insolvent; (4) on or within 90 days before the date of the bankruptcy filing; and (5) which enabled the creditor to receive more than he would have received in a Chapter 7 liquidation, absent the transfer.

As this case comes under advisement, the parties have stipulated to four of the necessary elements of a preference; only the existence of an antecedent debt is disputed. Proof was heard on this issue on November 10, 1983. Briefs have been submitted by both counsel, and an *amicus* brief was submitted by two similarly situated farmers.[1]

To determine whether the February 23 payment was made on account of an antecedent debt we must first determine when the debt was incurred.[2] A factual summary follows.

Between October 21, and November 13, 1981, Meredith delivered 3,543 bushels of grain to Wathen's Elevators, and received a "scale ticket" indicating the date and amount of delivery, the producer's name, and a notation of "deferred settlement." This farmer did not receive a "warehouse receipt" or "grain storage receipt" giving evidence of retained title in the grain. As part of its bookkeeping procedure, the elevator completed a grain settlement sheet on Meredith, recording the scale ticket numbers, the weight and number of bushels of grain delivered, and its grade. No other documents memorialize these transactions.

Meredith informed the elevator that he wanted to "cash-in"[3] on February 23, 1982. This demand triggered a final accounting of the grain previously left at the elevator on "deferred settlement." This farmer then went to the elevator, turned in his scale tickets, and received a check in the amount of $20,902.29, the current market price for 3,543 bushels of grain.

The ultimate issue is whether the debt to Meredith was incurred upon delivery, between October 21 and November 13, 1981, or when the producer demanded final settlement on February 23, 1982. The Code does not define the term "incurred," but we have guidance from relevant case law, and from other definitions supplied by the Code. The trustee contends that the debt to Meredith was incurred upon delivery, some 102–145 days prior to payment. Meredith takes a contrary position, and claims that the debt was incurred on the day of the settlement-payment, February 23.

The Court adopts the holding that "a debt is 'incurred' on the date upon which the debtor first becomes legally bound to pay."[4] Here that exact moment is, as the trustee contends, between October 21 and November 13, with each grain delivery. Delivery is the causative point because it is then that Wathen's became obliged to pay Meredith. The legal duty to pay arises

---

1. Joyce Dukes and Kendall Gentry.

2. Whether we deal with an *antecedent* debt, and when the debt was "incurred" is critical because Section 547(c) insulates certain preferential transfers from the trustee's avoidance powers. Subsection (c)(1) exempts a transfer that was intended to be and was in fact, a "contemporaneous exchange." Subsection (c)(1) exempts "ordinary course of business" transfers, those payments made not later than 45 days after the debt was incurred. Predictably, Meredith raises both defenses.

3. Testimony of Thomas Meredith on November 10, 1983.

4. This interpretation of when a debt is "incurred" is well established by case law. See *Matter of Emerald Oil Co.*, 695 F.2d 833 (5th Cir.1983); *In re Iowa Premium Service Co., Inc.*, 676 F.2d 1220 (8th Cir.1982); *Barash v.*

*Public Finance Corp.*, 658 F.2d 504 (7th Cir. 1981); *In re Naudain*, 32 B.R. 871 (Bkrtcy.E.D. Penn.1983); *In re Handsco Distributing, Inc.*, 32 B.R. 358 (Bkrtcy.S.D.Ohio 1983); *Matter of Richter & Phillips Jewelers & Distributors, Inc.*, 31 B.R. 512 (Bkrtcy.S.D.Ohio 1983); *In re Beck*, 25 B.R. 947 (Bkrtcy.N.D.Ohio 1983); *In re Caro Products*, 23 B.R. 245 (Bkrtcy.E.D.Mich.1982); *In re Fabric Buys of Jericho, Inc.*, 22 B.R. 1013 (Bkrtcy.S.D.N.Y.1982); *In re A.J. Nichols, Ltd.*, 21 B.R. 612 (Bkrtcy.N.D.Ga.1982); *In re Brown*, 20 B.R. 554 (Bkrtcy.S.D.N.Y.1982); *In re Valles Mechanical Industries, Inc.*, 20 B.R. 350 (Bkrtcy.N.D.Ga.1982); *Reese v. Akai America, Ltd.*, 19 B.R. 83 (D.C.S.D.Fla.1982); *Matter of Iowa Premium Service Co., Inc.*, 12 B.R. 597 (Bkrtcy.S.D.Iowa 1981); *In re Keeling*, 11 B.R. 361 (Bkrtcy.Minn.1981); *In re Ray W. Dickey & Sons, Inc.*, 11 B.R. 146 (Bkrtcy.N.D. Tex.1980); *In re McCormick*, 5 B.R. 726 (Bkrtcy.N.D.Ohio 1980); *In re Bowen*, 3 B.R. 617 (Bkrtcy.E.D.Tenn.1980).

upon delivery because it is then that the elevator acquires a property interest (title and possession) in the goods. In fact, KRS 355.2–507 expressly provides that delivery entitles the seller to payment.

Prior to delivery Wathen's would never have to issue a settlement check—there would be nothing to settle. All dates subsequent to delivery are identical, for *on any given day* Meredith could have activated the payment process by making demand.[5] Simply put, without delivery there is no obligation to pay, and at any time after delivery, at the seller's choice, the elevator must pay. For preference purposes, then, the debt is "incurred" at delivery.

This view of when the debt is incurred also flows logically from the Code's definitions of "debt" and "claim." A "debt" is a liability on a "claim."[6] And a "claim" is a right to payment whether or not such right is contingent, unmatured or disputed.[7] As of delivery Meredith had a right to payment (a "claim" arose); concurrently, Wathen's became liable on that claim (a "debt" arose). Whether Meredith's right to payment was contingent on his demand notice, and whether he chose to delay invoicing of that claim does not affect the underlying obligation.[8]

Having resolved the issue before the court in the trustee's favor, we will briefly explain why we found Meredith's arguments without merit and the Section 547(c) exceptions inapplicable.

In our preliminary report to the District Court in this proceeding,[9] we concluded that Wathen's was a "grain merchandiser." We noted that this "elevator does *not* act as a commercial bailee for grain producers who choose to store grain at a central elevator, are given a warehouse receipt, pay storage fees, and can demand return of their grain at any time."[10]

It quickly became apparent at the hearing in this preference dispute that farm parlance regarding grain dealings is, at best, loose and ambiguous. References by farmers to "my grain" in the warehouse, while understandable, do not mesh with the economic realities of state law and the nature of the transactions. We must reiterate that the Wathen elevator operates as a merchandiser and not as a central storage facility.

Our earlier merchandiser characterization was validated by testimony from the participants in this grain transaction, Meredith and two representatives of the elevator. All stated that they could not recall a farmer ever simply paying storage charges and getting grain back.[11]

We have considered Meredith's argument that he remained owner of the grain after delivery and through the point of final settlement, which would cast Wathen's in the role of a bailee. Meredith argues bailment theory because the corollary would be that the debt to Meredith was created by the February 23 "cash-in" order and that virtually simultaneous satisfaction occurred in the $20,902.29 check;[12] the contemporaneous transfer would defeat the preference element of antecedent debt.

We find the bailment argument unpersuasive for two reasons. First, although

---

5. Meredith acknowledges that he had complete control over determining the date of settlement (Brief p. 3); (Testimony at November 10 hearing).

6. 11 U.S.C. § 101(11).

7. 11 U.S.C. § 101(4).

8. As the Court in *In re Valles Mechanical Industries, Inc.*, supra, note 4, p. 353, properly noted: "... The mere fact that a bill is never sent does not mean that an obligation has not been created..."

9. *In re Wathen's Elevators, Inc.*, 32 B.R. 912 (Bkrtcy.W.D.Ky.1983).

10. Id. at p. 916 (Emphasis added).

11. Testimony by Robert Wathen, Ray Sheets and Thomas Meredith on November 10.

12. This time frame is Meredith's only possible entree into the § 547(c)(2) exception.

the grain delivered in late 1981 does qualify as "stored grain" under KRS § 251.410(4) and 302 KAR § 35.010 until payment in February, 1982, Meredith does not satisfy the definition of "owner" contained in KRS 251.010(2) or KRS 251.410(6). He is not a "person who owns grain against which no warehouse receipt has been issued,[13] or who holds a warehouse receipt [14] issued against any grain stored under this chapter." [15] Neither is Meredith a "person whose grain is in storage and has been issued a grain storage receipt." [16]

Thus, in this case we had "stored grain" between November, 1981, and February, 1982, but it wasn't Meredith's grain being stored. As we noted in our earlier report, UCC Article Two (KRS 355.2–101 et seq.) controls commercial transactions in goods. KRS 355.2–401(2) provides that title passes to the buyer when the seller completes physical delivery, unless the parties explicit-ly agree otherwise. Such was not the case here. Combining KRS § 355.2–401(2) and KRS § 251.510(4), we can only conclude that the "stored grain" belonged to Wathen's because title to the grain passed to the elevator upon delivery.

Secondly, we reject the bailment hypothesis on the basis of the previous conduct of the parties. Meredith stated that he had dealt with Wathen's before, and that he had never delivered grain and later withdrawn that same grain.[17] In other words, during the course of their dealings Meredith had never assumed the bailor role, nor had Wathen's functioned as a bailee.

Rejection of the bailment theory leads to the disapproval of its corollary—that the debt was created or incurred on February 23. As previously explained, we hold that debt incurrence took place on the various delivery dates. Thus, delivery preceded

---

**13.** Harris Trust & Savings Bank is the holder of warehouse receipts covering grain in Wathen's elevators.

**14.** Meredith holds a "scale ticket" received from Wathen's, not a warehouse receipt issued by a local board of agriculture pursuant to KRS § 251.160. The Kentucky Court of Appeals has previously been called upon to decide what qualifies as a "warehouse receipt." In *Martin v. St. Matthews Produce Exchange,* 265 Ky. 26, 95 S.W.2d 1119 (1936) it held that a farmer's receipt was *not* a "warehouse receipt;" that the receipt was for goods delivered for sale, not for storage; and that the receipt simply acknowledged delivery of a certain quantity with no purpose or disposition being indicated.

**15.** A careful reading of the grain warehouses statute, KRS §§ 251.010–251.330, highlights its *inapplicability* to the Meredith-Wathen's relationship. The stated purpose is to ensure supervision and protection of grain in storage (KRS 251.040). Furthermore, these sections are limited to farm-stored grain (KRS 251.200), with a warehouse receipt issued to cover each separate granary, crib or bin (KRS 251.190). This portion of the "warehousing" statute requires grain to be "sealed by the sealer" (KRS 251.170); makes it unlawful to remove the sealer's locks (KRS 251.180); and, provides for inspections by the sealer at least every 90 days (KRS 251.210).

**16.** This definition of "owner" is contained in that portion of the statute dealing with grain storage establishment licenses (KRS §§ 251.-410–251.510). The owner class is limited to holders of a *grain storage receipt,* but this key term is not defined. However, other sections refer to receipts, scale tickets, and warehouse receipts revealing legislative awareness of the varieties of documentation that might be generated in grain transactions. Legislative preceptiveness is also evident in the recordation requirements imposed on licensees: they must indicate whether the grain is sold, purchase contract, delay pricing, open storage, receipted storage, or grain bank, etc. (KRS § 251.480(i)). Significantly, this subsection recognizes "receipted storage" as a distinctive sort of grain transaction. Apparently, under KRS § 251.-410(6) this is the only situation in which the farmer would be an "owner." We arrived at this conclusion after a careful reading of the entire statute as it stood on May 12, 1982. We are neither persuaded nor bound by a 1980 Kentucky general's opinion to the effect that scale tickets would satisfy KRS § 251.410(6), because of amendments to other subsections which expanded recordkeeping requirements to include scale tickets. We are unable to follow the attorney general as he makes the inferential leap from recordation expansion to an enlarged owner class. It is our opinion that the legislature was cognizant of the definition of "owner" when it amended other portions of the licensing statute; it could have modified that description, but apparently chose to leave it intact.

**17.** Testimony by Thomas Meredith on November 10, 1982.

payment by 102–145 days, and the § 547(c)(2) time limit remains unsatisfied.[18]

We also find the § 547(c)(1) exception inapplicable to the grain transactions in question. That subsection insulates "substantially *contemporaneous exchanges*," in which the seller and buyer more or less simultaneously swap goods and payment. This exception is not meant to include a transaction in which the seller delivers goods (grain) but payment by the buyer can be indefinitely deferred.

On the facts of the present case, we would be severely straining the meaning of "contemporaneous exchange" to have it accomodate a transaction with a 102–145 day gap between delivery and payment. The course of dealing between these parties and the record before us indicates that Wathen's and Meredith did not contemporaneously exchange goods and payment, nor did they ever intend to do so.[19] Rather their transactions were pure *credit transactions* in which Meredith delivered grain and received no more than a promise of future payment from Wathen's.[20] As such, they do not fit within § 547(c)(1).

Meredith must be considered as simply an unsecured creditor of Wathen's Elevators, along with several other farmers, some of whom were paid shortly before bankruptcy and many more of whom remained unpaid altogether when the petition was filed. Along with other creditors of his class, Meredith will be treated equally in the disposition of the debtor's assets. The trustee's avoidance powers were included in the Code to achieve just this objective.[21] By today's ruling and the issuance of a turnover order, we give the intended meaning to the trustee's § 547 powers to effectuate equality of treatment among creditors.

**18.** The Meredith-Wathen's transaction is not the type of *"normal financial transactions"* that are kept current which § 547(c)(2) seeks to protect. H.R.Rep. No. 595, 95th Cong. 1st Sess. 373 (1977), U.S.Code Cong. & Admin. News 1978, 5787.

**19.** Thomas Meredith testified that he did not receive payment upon delivery because he wanted to wait for a better price for his grain

For the foregoing reasons, we hold that the $20,902.29 payment to Thomas Meredith was a preferential transfer under the terms of 11 U.S.C. § 547(b). Accordingly, we will by separate order direct Thomas Meredith to turn over that amount to Henry Dickinson, trustee for Wathen's Elevators, Inc.

and that he *couldn't* settle until January 1, 1983 for tax reasons.

**20.** See *In re Naudain, supra,* note 4, which also held "credit transactions" to be outside the scope of § 547(c)(1).

**21.** H.R.Rep. No. 595, 95th Cong., 1st Sess. 177–78 (1977); *Matter of Rettig,* 32 B.R. 523 (Bkrtcy.D.Del.1983).